# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-15-00125-CR
## NO. 03-15-00126-CR

**James Robert Montoya, Jr., Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF HAYS COUNTY, 207TH JUDICIAL DISTRICT
NOS. CR-12-0635 & CR-12-0637, HONORABLE JACK H. ROBISON, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

James Robert Montoya, Jr. was charged with one count of aggravated kidnapping and two counts of aggravated sexual assault. *See* Tex. Penal Code §§ 22.021, .04. At trial, the jury found Montoya guilty of each charged offense and assessed punishment at life imprisonment for each offense, which the trial court ordered be served concurrently. On appeal, Montoya asserts that the trial court abused its discretion by allowing the State to pose an improper commitment question to the jury panel. Montoya also challenges the legal sufficiency of the evidence supporting the jury's failure to find that he released the victim in a safe place. We will affirm the trial court's judgments.

## BACKGROUND[1]

M.A., the victim in this case, was returning to her home in New Braunfels after leaving her job at Taco Bell at approximately 1:15 a.m. The victim was traveling south on Interstate Highway 35 when her car ran out of gas and stalled just north of San Marcos near the Blanco River turnaround. After trying to call family and friends for help, M.A. decided to walk to the nearest gas station, which was two exits away. Shortly after M.A. began walking, Montoya pulled up next to her in his truck and asked M.A. if she wanted a ride to the gas station. After some hesitation, M.A. got into Montoya's truck because it was dark, the weather was very cold, and it was a long walk to the nearest gas station.

Instead of driving to a gas station, Montoya drove to a construction area located at the underpass of the Blanco River turnaround. After Montoya parked his truck, M.A. became very scared and decided to get out of the car and try to run away. Montoya chased after M.A., pulled her backwards by her hair, and punched her in the face while she was lying on the ground. After several physical altercations, Montoya took M.A. back to his truck where he sexually assaulted her. During the sexual assault, M.A. was able to reach for an empty beer bottle in the vehicle and used it to hit Montoya on the head. Montoya then opened the passenger side door and pushed M.A. out of his truck and onto the ground, leaving her with no pants on and with her shirt ripped open. Montoya threw M.A.'s clothes, phone, and purse out of his truck, and told her to turn around and start walking away from the truck while he drove away.

---

[1] The facts recited herein are taken from the testimony and other evidence presented at trial.

Montoya was indicted for the offenses of aggravated kidnapping and aggravated sexual assault. The jury found Montoya guilty of the charged offenses and assessed punishment at life imprisonment for each charge, to be served concurrently. This appeal followed.

## DISCUSSION

### *Commitment Question*

In his first point of error, Montoya contends that the district court erred by overruling his objection to what he asserts was an improper commitment question posed to the venire by the State during voir dire. During voir dire the State asked the following question:

> Okay. So is there a hypothetical set of facts where you can consider probation for aggravated kidnapping and aggravated sexual assault? For instance, a young married couple going through a tumultuous relationship. They are separated. There's allegations of infidelity between both of them, on either side, but they are thinking about working it out. He calls her up and says, Hey, I want to take you out on a date. Let's go get a dinner and a movie. Right. She says reluctantly, Okay. He goes and picks her up and he drives, but he doesn't go near a restaurant or a theater, but instead he goes to a remote park and he parks the vehicle. Right. Here you have deception, secreting to a place not likely to be found. Okay. She's worried. He's becoming agitated that she's not giving in to his advances in the car. He starts kissing on her neck and she's pushing away, and he slaps her, and she is pushing away and he punches her. All right. Maybe he pulls her pants down and he touches her. Okay. And she pushes away, she opens the door and she runs, and she calls the cops. So you have contact, right, with her sexual organ. You have aggravated sexual assault. You have aggravated kidnapping. Let's assume for the moment that those set of facts meet the elements of that crime. Now, that man has never before ever committed any crime. He's young. He has a job. He's remorseful. Probation is ten years, fines, classes, course work, intensive supervision. He's a candidate. A good one. And it is available to him. Is there anybody here under those hypothetical facts that would not consider probation?

The trial court overruled Montoya's objection that this question was an improper commitment question under the guidelines set out in *Standefer v. State*, 59 S.W.3d 177 (Tex. Crim. App. 2001).[2]

A commitment question is one that commits a prospective juror to resolve, or refrain from resolving, an issue a certain way after learning a particular fact. *See Hernandez v. State*, 390 S.W.3d 310, 315 (Tex. Crim. App. 2012) (citing *Standefer*, 59 S.W.3d at 179). Not all commitment questions are improper. *Standefer*, 59 S.W.3d at 181. For a commitment question to be proper (1) the question must elicit a response that gives rise to a challenge for cause, and (2) the question must include only the facts necessary to establish a challenge for cause. *Id.* at 181-82. "Commitment questions require a venireman to promise that he will base his verdict or course of action on some specific set of facts before he has heard any evidence, much less all of the evidence in its proper context." *Sanchez v. State*, 165 S.W.3d 707, 712 (Tex. Crim. App. 2005). "[T]he purpose for prohibiting improper commitment questions by either the State or the defendant is to ensure that the jury will listen to the evidence with an open mind—a mind that is impartial and without bias or prejudice—and render a verdict based upon that evidence." *Id.* Often a commitment question will elicit a "yes" or "no" response, but a question can be open-ended and still be considered a commitment question as long as "the question asks the prospective juror to set the hypothetical parameters for [his or her] decision-making." *Standefer*, 59 S.W.3d at 179-80. In *Standefer*, the court held that "the word 'consider' often marks a commitment question in which the

---

[2] The court subsequently allowed the question to be answered, but also stated that the question should include the fact that, if convicted, "[Montoya] is going to be a lifetime sex offender if it is sexual assault and he is going to have to register."

4

prospective juror is asked to refrain from resolving an issue after learning a fact that could be used to resolve that issue." *Id*. at 180.

The trial court has broad discretion over the jury selection process and whether to grant or deny any objections posed by either party. *Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002)*; Standefer*, 59 S.W.3d at 181. "Decision as to the propriety of a particular question on voir dire examination is left to the trial judge's discretion and only an abuse of such discretion will call for reversal on appeal." *Allridge v. State*, 762 S.W.2d 146, 167 (Tex. Crim. App. 1988). An abuse of discretion occurs when a proper question about a proper area of inquiry is prohibited or when an improper question is allowed to be asked. *Barajas*, 93 S.W.3d at 38; *Allridge*, 762 S.W.2d at 163.

In this case, the answer to the proposed question would give rise to a challenge for cause of any venire member who would not consider probation because the juror would not consider the full range of punishment. This, standing alone, would make it a proper commitment question. The question asked, however, also included numerous specific facts beyond what would be necessary to sustain a challenge for cause because they were beyond the scope of the statutory elements of the relevant offenses. *See Standefer*, 59 S.W.3d at 182; *see also Cardenas v. State*, 325 S.W.3d 179, 189 (Tex. Crim. App. 2010); *Sells v. State*, 121 S.W.3d 748, 756 (Tex. Crim. App. 2003); *Atkins v. State*, 951 S.W.2d 787, 790 (Tex. Crim. App. 1997). Thus, it appears the State asked an improper commitment question. We need not decide this issue squarely, however, because ultimately the harm analysis with regard to this question is dispositive.

The record does not reflect that the trial court's error, if any, in allowing this question amounted to harmful error. Because it is non-constitutional error, Rule 44.2(b) of the Texas Rules

5

of Appellate Procedure provides the standard for reviewing whether error in allowing the State to ask an improper commitment question during voir dire was harmful. *See Sanchez*, 165 S.W.3d at 713-14; *see also* Tex. R. App. P. 44.2(b) ("Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").[3] Thus, to determine whether an improper commitment question was harmful we must assess whether the error had a substantial and injurious effect or influence in determining the jury's verdict. *See Rich v. State*, 160 S.W.3d 575, 577-78 (Tex. Crim. App. 2005). The focus of the harm analysis should be on "whether a biased juror—one who had explicitly or implicitly promised to prejudge some aspect of the case because of the State's improper questioning—actually sat on the jury." *Sanchez*, 165 S.W.3d at 713. Ultimately, the question is whether the defendant was tried by an impartial jury or, conversely, whether the jury or any particular juror was "poisoned" by the improper commitment question with regard to a legal issue or fact important to the verdict or sentence. *Id*.

To determine whether allowing an improper commitment question to be posed to the venire was harmful, appellate courts consider the following factors:

> 1) whether the questions were unambiguously improper and attempted to commit one or more venire member to a specific verdict or course of action;
>
> 2) how many, if any, venire members agreed to commit themselves to a specific verdict or course of action if the State produced certain evidence;
>
> 3) whether any venire members who committed themselves actually served on the jury;

---

[3] Montoya incorrectly asserts that this Court should conduct the harm analysis using the standard set forth in Rule 44.2(a). *See* Tex. R. App. P. 44.2(a) (harm analysis for constitutional error).

4) whether the defendant used peremptory challenges to eliminate any or all of the venire members who committed themselves;

5) whether the defendant exhausted all of his peremptory challenges on those venire members who committed themselves and requested additional peremptory challenges;

6) whether the defendant timely asserted that a named objectionable venire member actually served on the jury because he had to use peremptory challenges on improperly committed jurors; and

7) whether there is a reasonable likelihood that the jury's verdict or course of action in reaching a verdict or sentence was substantially affected by the State's improper commitment questioning during voir dire.

*Id*. at 714. These factors are not an exclusive list of factors the reviewing court may consider and, depending on the particular circumstances, a reviewing court might use additional or different factors to assess the ultimate question of harm. *Id*.

After the trial court overruled Montoya's objection and permitted the question to be answered, two venire members expressly stated that they would not consider probation for aggravated sexual assault and aggravated kidnapping as described in the State's hypothetical question. Venire members Engle and Lopez indicated that based on the hypothetical situation presented by the State, they would not consider probation during sentencing. During voir dire, counsel for the State acknowledged the venire members' improper commitment when he stated, "I want to check one more time, that full range of punishment, other than Ms. Engle and Mr. Lopez, does anybody have an issue with what we have discussed of considering, not an obligation, considering the full range of punishment?"

Although there were two venire members who stated that they could not consider probation for aggravated sexual assault and aggravated kidnapping, nothing in the "Jury Pool

7

Report" or elsewhere in the record shows that these venire members actually served on the jury. In fact, the Jury Pool Report and record from voir dire indicates that venire members Engle and Lopez were struck for cause and that Montoya did not use any of his peremptory challenges to strike them. The record also shows that this series of questions was a small part of a lengthy discussion about the importance of keeping an open mind and considering all of the evidence. Only two venire members responded to the commitment question and, although the question was posed to the entire panel of potential jurors, the likelihood that the jury's verdict was substantially affected by the State's commitment questioning during voir dire is very low.

During voir dire and the punishment phase of this case, the trial court consistently reminded the jurors of their duty to consider the full range of punishment including probation or community supervision. The trial court stated that "in order to be on the jury you have to be able to follow the law [and] [p]art of following the law is that you must be able to at least consider as little as probation or as much as 99 years in prison." Finally, we observe that the evidence supporting the jury's verdict may fairly be characterized as strong, which mitigates against a finding of harm. *See Easley v. State*, 424 S.W.3d 535, 542-43 (Tex. Crim. App. 2014). On this record, we conclude that any error in overruling Montoya's objection to the State's question was harmless. We overrule Montoya's first point of error.

### *Release in a Safe Place*

Montoya's second point of error challenges the legal sufficiency of the evidence supporting the jury's failure to find that Montoya released M.A. in a safe place. A person commits the offense of aggravated kidnapping if he intentionally or knowingly abducts another person with

8

the intent to facilitate commission of a felony, inflict bodily injury, or violate or abuse the victim sexually. Tex. Penal Code § 20.04(a). If a defendant proves by a preponderance of the evidence that he voluntarily released the victim in a safe place, aggravated kidnapping is reduced from a first-degree to a second-degree felony at the punishment stage. *See id*. § 20.04(d). The burden is on the defendant to prove, by a preponderance of the evidence, that he voluntarily released the victim in a safe place. *Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015).

In a legal sufficiency review of an affirmative defense, we review the record for evidence favorable to the factfinder's finding and disregard all the evidence to the contrary unless a reasonable fact finder could not. *See Matlock v. State*, 392 S.W.3d 662, 669-70 (Tex. Crim. App. 2013). If the record contains more than a scintilla of evidence to support the jury's finding it is supported by legally sufficient evidence. *Id.* If it does not, we may overturn the jury's finding only if the appealing party establishes that the evidence conclusively proves the affirmative defense and no "reasonable [fact finder] was free to think otherwise." *Id*. at 670.

Montoya contends that the evidence supporting the jury's failure to find that he released M.A. in a safe place was legally insufficient. Specifically, Montoya asserts that his burden was met by evidence that he gave M.A. her clothes and cell phone back. Montoya also relies on evidence that M.A. was familiar with the area he left her in because her friend lived in a mobile home down the street from where he released her and it was next to a major interstate. As a result, Montoya claims, he met his burden of demonstrating that he voluntarily released M.A. in a safe place, and that the State failed to meet its burden of convincing the jury that the place where Montoya left the victim was unsafe beyond a reasonable doubt.

9

The determination of whether a location is a safe place under section 20.04(d) is a "fact-specific inquiry made on a case-by-case basis, considering the totality of the circumstances." *Butcher*, 454 S.W.3d at 19. The parties do not dispute that M.A. was voluntarily released; the only issue is whether she was released in a safe place. Courts may consider the following seven factors in determining whether a place of release was safe: (1) the remoteness of the location, (2) the proximity of help, (3) the time of day, (4) the climate, (5) the condition of the complainant, (6) the character of the location and surrounding neighborhood, and (7) the complainant's familiarity with the location or neighborhood. *Id.*; *Rodriguez-Flores v. State*, 351 S.W.3d 612, 636 (Tex. App.—Austin 2011, pet. ref'd); *Williams v. State*, 718 S.W.2d 772, 774 (Tex. App.—Corpus Christi 1986), *aff'd in part and rev'd in part on other grounds*, 851 S.W.2d 282 (Tex. Crim. App. 1993). However, these factors are "merely nonexclusive aids." *Id*.

During trial the State presented a substantial amount of evidence that supports the jury's finding that Montoya released the victim in an unsafe place. The location, time of day, climate conditions, condition of the victim, and the character of the location where M.A. was left all support the jury's finding that Montoya did not release M.A. in a safe place. M.A. testified that the sexual assault and kidnapping occurred in the early hours of the morning after she got off work at 1:15 a.m. She further testified that although Montoya gave her clothes back to her, he left her outside on a cold February evening and that some articles of her clothing were ripped during the sexual assault. Additionally, M.A., the police officers, and the first responders described the area where Montoya left M.A. as being "extremely dark at night," "not a good area for cell service," and as a "space on the underpass, where they have, like, the highway bricks." The State also presented testimony and

10

aerial photographs demonstrating that the place Montoya left M.A. was under the highway, out of the view of other motorists, and not somewhere she would have been easily found or able to get help. Finally, M.A.'s condition at the time of her release supports the finding that a highway underpass was not a safe place to leave her. M.A., police officers, and the 911 dispatcher who answered M.A.'s phone call testified that M.A.—who had been sexually assaulted and had her clothes ripped off of her—was extremely afraid for her safety and was crying so much that it was difficult to understand what she was saying.

There was more than a scintilla of evidence presented at trial to support the jury's finding that the location where Montoya left M.A. was not safe. Consequently, we need not consider whether Montoya established his affirmative defense as a matter of law. *See Matlock*, 392 S.W.3d at 670. Having concluded that the evidence at trial was legally sufficient to support the jury's rejection of Montoya's affirmative defense, we overrule his second point of error.

## CONCLUSION

We overrule Montoya's two appellate issues and affirm the judgments of conviction.

_____

Scott K. Field, Justice

Before Justices Puryear, Goodwin, and Field

Affirmed

Filed: August 23, 2016

Do Not Publish

11